Stephen F. English, OSB No. 730843
SEnglish@perkinscoie.com
Sarah J. Crooks, OSB No. 971512
SCrooks@perkinscoie.com
C. Rian Peck, OSB No. 144012
RPeck@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

Ben Stafford (pro hac vice)
BStafford@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101
Telephone:  206.359.8000
Facsimile:  206.359.9000

*Attorneys for Legacy Health and Legacy Emanuel Hospital &
Health Center*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **JULIANNE HUNTER, Individually and On Behalf of All Others Similarly Situated**, <br><br> Plaintiff, <br><br> v. <br><br> **LEGACY HEALTH, LEGACY EMANUEL MEDICAL CENTER, LEGACY EMANUEL HOSPITAL & HEALTH CENTER, LEGACY HEALTH PARTNERS, LLC, RANDALL CHILDREN'S HOSPITAL AT LEGACY EMANUEL**, <br><br> Defendant. | No. 3:18-cv-002219-AC <br><br> **Defendants' Opposition to Plaintiff's Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(B)** <br><br> Oral argument requested <br><br> Public Filed Version <br> Confidential Information Redacted <br> Pursuant to Stipulated Protective Order |

1-    Defendants' Opposition to Plaintiff's Motion for
      Conditional Certification

148459293. 6

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 2

      I.     Legacy and Its Policies and Practices Related to Meal Breaks, Off-the-Clock,
and Overtime Work ........................................................................................ 2

      II.    Named Plaintiff Julianne Hunter and Her Efforts to Gather Opt-In Plaintiffs
Over the Past Eighteen Months ...................................................................... 5

Argument ......................................................................................................................... 8

      I.     Conditional certification should be denied because the proposed collective of
plaintiffs is not similarly situated in ways that are material to the resolution of
their claims. .................................................................................................... 8

            A.    This Court should apply the intermediate "modest plus" standard to
evaluate whether Hunter, the opt-in plaintiffs, and the Proposed
Collective are similarly situated to one another. ................................. 10

            B.    Hunter and the opt-in plaintiffs' own declarations and evidence
demonstrate that the Proposed Collective is not similar in ways
material to the resolution of their claims. ........................................... 12

                  1.    Hunter's theory that the Proposed Collective remained on
duty during unpaid, uninterrupted meal breaks requires a fact-
laden inquiry, and Hunter's own evidence demonstrates that
they are not similarly situated with respect to the facts
material to resolving their claim. ............................................ 13

                  2.    Hunter's remaining theories regarding how the Proposed
Collective is similarly situated for purposes of the FLSA are
also contradicted by her own evidence. .................................. 18

                  3.    Given the material disparities between Hunter and the opt-in
plaintiffs' own experiences, this Court should deny
conditional certification of the Proposed Collective. ............. 20

      II.    If the Court grants conditional certification, it should modify Hunter's
proposed form of notice because it is misleading and fails to apprise potential
plaintiffs of their rights and risks ................................................................. 23

      III.   Hunter is not entitled to equitable tolling because run of the mill litigation
delays—including delays attributable to Hunter alone—do not justify setting
aside the statute of limitations. ..................................................................... 25

Conclusion .................................................................................................................... 29

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

CASES

*Armour & Co. v. Wantock*,
   323 U.S. 126 (1944) ............................................................................................. 13, 14, 17

*Behnken v. Luminant Mining Co., LLC*,
   997 F. Supp. 2d 511 (N.D. Tex. 2014) ................................................................................. 24

*Belaire-West Landscape, Inc. v. Superior Court*,
   149 Cal. App. 4th 554 (2007) ..................................................................................... passim

*Bernard v. IBP, Inc. of Nebraska*,
   154 F.3d 259 (5th Cir. 1998) .............................................................................................. 14

*Blaney v. Charlotte-Mecklenburg Hosp. Auth.*,
   2011 WL 4351631 (W.D.N.C. Sep. 16, 2011) ....................................................................... 9

*Brown v. Permanente Med. Grp. Inc.*,
   2017 WL 1536493 (N.D. Cal. Mar. 2, 2017) ....................................................................... 17

*Campbell v. City of Los Angeles*,
   903 F.3d 1090 (9th Cir. 2018) ...............................................................................9, 10, 13, 17

*Carter v. Jackson-Madison Cnty. Hosp. Dist.*,
   2011 WL 1256625 (W.D. Tenn. Mar. 31, 2011) .................................................................. 29

*Colozzi v. St. Josephs Hosp. Health Center*,
   595 F. Supp. 2d 200 (N.D.N.Y. 2009) ................................................................................. 22

*Creely v. HCR Manorcare, Inc.*,
   789 F. Supp. 2d 819 (N.D. Ohio 2011) .......................................................................... 10, 11

*Fengler v. Crouse Health Found., Inc.*,
   595 F. Supp. 2d 189 (N.D.N.Y. 2009) ................................................................................. 22

*Goudie v. Cable Comms., Inc.*,
   2008 WL 4628394 (D. Or. Oct. 14, 2008) ................................................................... passim

*Hamelin v. Faxton-St. Luke's Healthcare*,
   2009 WL 211512 (N.D.N.Y. Jan. 26, 2009) ........................................................................ 22

*Hintergerger v. Catholic*,
   2009 WL 3464134, at *6-7 (W.D.N.Y. Oct. 21, 2009) ................................................... 22, 23

*Hoffmann-La Roche, Inc. v. Sperling*,
   493 U.S. 165 (1989) ............................................................................................................ 23

1-   Defendants' Opposition to Plaintiff's Motion for
     Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

*Irwin v. Department of Veterans Affairs*,
498 U.S. 89 (1990) .......................................................................................................... 25

*Lee v. Coahoma Cnty., Miss.*,
937 F.2d 220 (5th Cir. 1991) .......................................................................................... 14

*Menominee Indian Tribe of Wisconsin v. U.S.*,
136 S. Ct. 750 (2016) ...................................................................................................... 25

*Norman v. Dell*,
2008 WL 2899722 (D. Or. July 10, 2008) ..................................................................... 13

*Potoski v. Wyo. Valley Health Care Sys.*,
2013 WL 6731035 (M.D. Pa. Dec. 19, 2013) ................................................................ 17

*Ramirez v. Ghilotti Bros. Inc.*,
941 F. Supp. 2d 1197 (N.D. Cal. 2013) ............................................................................ 9

*Roy v. Cnty. of Lexington, S.C.*,
141 F.3d 533 (4th Cir. 1998) .......................................................................................... 15

*Saleen v. Waste Mgmt., Inc.*,
649 F. Supp. 2d 937 (D. Minn. 2009) ......................................................................... 9, 17

*Santinac v. Worldwide Labor Support of Illinois, Inc.*,
107 F. Supp. 3d 610 (S.D. Miss. 2015) .......................................................................... 24

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ................................................................................................... 13, 14

*Straka v. Methodist Dallas Med. Center Auxiliary*,
2018 WL 1611865 (N.D. Tex. Apr. 3, 2018) ................................................... 9, 15, 16, 17

*Wallace v. Kato*,
549 U.S. 384 (2007) ........................................................................................................ 25

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# Introduction

Now that named plaintiff Julianne Hunter has realized there is no one who falls within the definition of the original collective action she proposed, she has pivoted and offered several vague, scattershot theories of how her new proposed collective is "similarly situated" for purposes of the Fair Labor Standards Act (FLSA). Originally, Hunter sought to bring a collective action on behalf of herself and all hourly, non-exempt "nurses, nursing aides, nursing assistants or other employees with similar job duties employed by Defendants nationwide and subjected to an automatic time deduction policy" within three years before the filing of her Complaint. Compl. ¶ 48 (ECF 1) (emphasis added). In its Answer, Legacy responded that no one fit that definition because Legacy switched from using an "auto-deduct" timekeeping system to a manual clocking system on June 14, 2015, more than three years before Hunter filed her Complaint. Answer ¶ 2 (ECF 17).

The collective action Hunter now seeks to conditionally certify is markedly different, in that it makes no mention of an auto-deduct policy—or indeed, any policy. *See* Plf.'s Br. at 2 (ECF 78). Her new theory is that the Proposed Collective is similarly situated for one of three reasons: (1) Legacy does not provide nurses, nurse assistants, nurse aides, or any "other employees with similar job duties" with bona fide meal periods because they all must remain on call during meal breaks; (2) Legacy requires all of them to work off-the-clock before or after their shifts; and (3) Legacy requires employees to seek overtime approval and unjustly denies them overtime pay if they do not obtain that approval. *Id.* at 1-2; 21.

The problem with Hunter's theories is that her definition of the Proposed Collective is still far too broad—in terms of positions of employees and the facilities at which they worked— especially in light of the evidence she has gathered and submitted to this Court. In fact, that evidence reveals that there is no common policy or experience amongst even the nine declarants (only eight of whom are actually opt-in plaintiffs). Her proposed collective action is therefore not susceptible to common resolution. This Court should deny her motion for conditional certification

1-  Defendants' Opposition to Plaintiff's Motion for
    Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

or, alternatively, significantly narrow the proposed collective and the theories under which they may proceed.

Regarding Hunter's request for equitable tolling, there has been no "extraordinary external obstacle" preventing her from providing notice to potential opt-in plaintiffs. Legacy was justified in seeking to narrow the broad "class list" she sought. *See generally*, Order on Parties' Discovery Motions (ECF 58). And Legacy was prepared to begin producing documents in response to Hunter's discovery requests simultaneously with serving its written responses and objections in June 2019, provided that the parties had reached agreement on, and this Court had entered, a stipulated protective order. (Declaration of C. Rian Peck in Support of Legacy's Opposition to Hunter's Motion for Conditional Certification ("Peck Decl."), ¶ 2, Exs. 2 & 3.) Hunter's legal team knew as much—Legacy's position was memorialized in its discovery responses—yet, they sat on the draft protective order that Legacy had circulated for nearly one year. (*Id.*; *id.* ¶ 8, Ex. 6.) The primary obstacle to Hunter receiving the documents she believed were necessary to moving for conditional certification was thus not Legacy, but her own team's lack of urgency in pursuing her case. This Court should therefore deny Hunter's request for equitable tolling, too.

# Background

## I.    Legacy and Its Policies and Practices Related to Meal Breaks, Off-the-Clock, and Overtime Work

Legacy is a nonprofit health system that comprises six hospitals, 27 primary care clinics, around 90 specialty clinics, and 19 urgent care clinics in along the Willamette Valley in Oregon and Southwest Washington. (Declaration of Eve Logsdon in Support of Opposition to Motion for Conditional Certification ("Logsdon Decl.") ¶ 2.) Legacy Emanuel Hospital & Health Center is in North Portland and comprises two hospitals: Emanuel, a Level I trauma center, and Randall, a children's hospital. (*Id.* ¶ 4.) Together, Emanuel and Randall serve the highest patient population and have the highest concentration of Registered Nurses in the Legacy health system. (*Id.* ¶ 5.) They also

2-    Defendants' Opposition to Plaintiff's Motion for
Conditional Certification

148459293. 6

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

have the greatest range of patient acuity levels—ranging from emergency services for patients flown in via LifeFlight, to scheduled outpatient oncology and physical therapy appointments. (Declaration of Linda Jones in Support of Opposition to Motion for Conditional Certification ("Jones Decl.") ¶ 3; Declaration of Cynthia Hill in Support of Opposition to Motion for Conditional Certification ("Hill Decl.") ¶ 4.)

Emanuel and Randall, as well as Legacy Good Samaritan Medical Center (also in Portland), are regional hospitals that serve an expansive geographic area in Oregon, Washington, and Idaho. (Logsdon Decl. ¶ 3.) Emanuel and Randall differ even from Good Samaritan, in that Good Samaritan is neither a Level I trauma center nor a children's hospital. (*Id.*) And Legacy's remaining hospitals further differ from Emanuel and Randall—they are community hospitals, serving patients from the immediate vicinity who present with lower acuity levels. (*Id.*) As for Legacy's 136 clinics, all of them are outpatient clinics that are open during set hours and serve patients on an appointment-only basis, with the exception of the 19 urgent care clinics, which are also open during set hours but accept both walk-ins and appointments. (*Id.*)

Legacy maintains an overarching policy regarding meal breaks and off-the-clock work for hourly, non-exempt employees. (Logsdon Decl. ¶¶ 6-7, Exs. A-D (filed under seal).) That is, it requires that all employees who work the requisite number of hours be afforded the opportunity to take a 30-minute, unpaid, uninterrupted meal break during which they are relieved of all duties. (*Id.*) It prohibits employees from performing off-the-clock work. (*Id.* ¶ 8.) And it prohibits supervisors from requiring employees to perform off-the-clock work. (*Id.*) How hourly, non-exempt employees receive overtime pay is a function of the agreement they've reached with Legacy—they receive overtime pay either by exceeding 40 hours in a workweek or by exceeding 8 hours in a workday or 80 hours in 14 days. (Logsdon Decl. Ex. D, at LEH00001899.) *See also* Fair Labor Standards Act, 29 U.S.C. § 207(a)(1), (j). Legacy requests that its hourly, non-exempt employees seek manager approval

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

before incurring overtime hours but pays those employees overtime rates for the overtime hours it knows they work, regardless of whether they receive manager approval. (Logsdon Decl. ¶ 9.)

Because of the differences in patient volume, patient acuity, and the general needs of each unit, Legacy empowers its managers to run their units in the manner that best serves their patients, nurses, and other staff. (Jones Decl. ¶ 9; Hill Decl. ¶ 6-8.) Unit managers are responsible for, among other things, developing annual budgets and staffing plans, tracking budget utilization, administering meal breaks, and developing a system for approval of overtime work. (Jones Decl. ¶ 6; Hill Decl. ¶ 6.) With respect to meal breaks, some unit managers hire "float" or "break" nurses who do not have specific patient assignments and instead relieve other nurses during their breaks; others require their nurses to use the "buddy system," taking turns covering each other's patient assignments during breaks; and others use different systems. (Jones Decl. ¶ 9-10; Hill Decl. ¶ 8.) With respect to overtime approval, some unit managers ask nurses to contemporaneously sign an overtime log stating the reason for their overtime work; others have nurses email them regarding overtime approval; and others use different systems. (Jones Decl. ¶ 11; Hill Decl. ¶ 10.) As a result, though Legacy maintains systemwide policies, how those policies are implemented is decentralized and varies unit-by-unit, hospital-by-hospital, and clinic-by-clinic.[1] (Jones Decl. ¶ 7, 9-10; Hill Decl. ¶ 6, 8-10; Logsdon Decl. ¶ 10.)

It also varies depending on the position the employee holds. That is, unlike Registered Nurses, Certified Nurse Assistants (CNAs), licensed practical nurses (LPNs), and technicians (collectively, "Assistive Personnel") work under the supervision of and at the direction of Registered Nurses. (Jones Decl. ¶ 13; Hill Decl. ¶ 12-13.) They are not ultimately responsible for creating and carrying out a patient's plan of care. (Jones Decl. ¶ 13; Hill Decl. ¶ 12-13.) And when Assistive Personnel are gone, the Registered Nurse is still attending to the patient's needs. (Jones Decl. ¶ 13;

---

[1] That is not where the differences end. Certified Nursing Assistants at Emanuel and Legacy Good Samaritan are subject to two different union contracts. Registered Nurses at Legacy Silverton are part of another union contract. (Logsdon Decl. ¶ 11.)

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Hill Decl. ¶ 12-13.) As a result, Assistive Personnel do not need to ensure that other Assistive

Personnel are available to cover their patient assignments; the Registered Nurses will still be there.

(Jones Decl. ¶ 13; Hill Decl. ¶ 13.) Because of the duties of Assistive Personnel—which include

tasks such as taking a patient's blood pressure, helping a patient bathe, and assisting a patient when

walking to the restroom—those Assistive Personnel are rarely (if ever) interrupted during meal

breaks. (Jones Decl. ¶ 13; Hill Decl. ¶ 12-13.) They also have fewer charting responsibilities in light

of the nature of their duties. (Jones Decl. ¶ 13; Hill Decl. ¶ 12-13.) To add to the differences,

Assistive Personnel at Emanuel do not participate in the Registered Nurse-to-Registered Nurse

patient handoff "huddles" at the beginning and end of their shifts, but Assistive Personnel at

Randall do. (Jones Decl. ¶ 13; Hill Decl. ¶ 13.) Thus, to the extent any managers disobey Legacy's

policies prohibiting off-the-clock work and require Registered Nurses to arrive early or stay late

during those huddles (which Legacy denies), that would not apply to Assistive Personnel at

Emanuel, who do not participate in the huddles. (Jones Decl. ¶ 13.)

Before the Proposed Collective period, Legacy used an exception-based reporting

timekeeping system. (Logsdon Decl. ¶ 6.) It switched to using a manual clocking system on June 14,

2015, nearly one year before Hunter was terminated and over three years before she filed this

lawsuit. (*Id.* ¶¶ 7, 12; *see also* Compl. (ECF 1).) Using the manual clocking system, all hourly, non-

exempt employees clock out during meal breaks. (Logsdon Decl. ¶ 8.) If they are interrupted at any

time during that 30-minute meal break, they are required to clock in and will be compensated for the

entire 30 minutes. (*Id.* ¶ 8.)

## II.    Named Plaintiff Julianne Hunter and Her Efforts to Gather Opt-In Plaintiffs Over the Past Eighteen Months

Hunter is a highly technically skilled Critical Care Registered Nurse who formerly worked

with the most acute of patients at Randall and Emanuel. (Logsdon Decl. ¶ 12; *see also* Jones Decl. ¶

14; Hill Decl. ¶ 14.) Her primary position was as a Critical Care Registered Nurse in Randall's

5-   Defendants' Opposition to Plaintiff's Motion for
Conditional Certification

148459293. 6

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

pediatric intensive care unit (PICU) during the night shift. (Logsdon Decl. ¶ 12.) While at Randall, she also became certified as an extracorporeal membrane oxygenation (ECMO) specialist. (*Id.*) The ECMO machine is most commonly used as a means of last resort for patients experiencing multiple system failure—it oxygenates their blood so their heart and lungs do not have to do that work and the body can focus its energy elsewhere. (Jones Decl. ¶ 14; Hill Decl. ¶ 14.) Given the vital function that machine performs, an ECMO specialist like Hunter must be physically present in the patient's room essentially at all times to supervise the machine and respond immediately to emergencies. (Jones Decl. ¶ 14; Hill Decl. ¶ 14.) Hunter worked as an ECMO specialist in the Randall PICU and sometimes in the Randall neonatal intensive care unit (NICU) and the Emanuel neurotrauma intensive care unit (NT-ICU). (Logsdon Decl. ¶ 12.)

Though Hunter's experience as a Registered Nurse in three units at Emanuel and Randall was specific and demanding, she seeks to conditionally certify a collective under the FLSA of every nurse, nurse assistant, nurse aide, "and other employees with similar job duties" who worked at any Legacy hospital, primary care clinic, specialty clinic, or urgent care clinic from March 22, 2016 until the resolution of this action (the "Proposed Collective").[2] Plf.'s Br. at 2 (ECF 78). Recognizing that Legacy's written policies are lawful on their face and that Hunter had "provided no evidence to demonstrate that the job duties of individuals in various positions across a variety of facilities are likely to be similar to that of [her position as] an intensive care RN," or that "the variety of positions fall under [her] definition of 'nursing staff' are similarly situated as to reasonably suggest inclusion in the class," this Court granted but narrowed Hunter's request for a "class list" by requiring Legacy to provide contact information for a random sample of 600 "nursing staff" employees who worked at Emanuel or Randall over a period of six years, using the *Belaire-West*[3] notice and opt-out process to

---

[2] This is a departure from her Complaint, in which she sought to certify a collective of hourly, non-exempt "nursing staff" who were "subjected to an automatic time deduction policy," during a three-year period. Compl. ¶ 48 (ECF 1).

[3] *Belaire-West Landscape, Inc. v. Superior Court*, 149 Cal. App. 4th 554 (2007).

6-   Defendants' Opposition to Plaintiff's Motion for
     Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

allow these employees an opportunity to request that their contact information not be provided to plaintiff's counsel. (ECF 52 at 16.)

At the same time, in light of plaintiff's counsel's representations both in briefing and in oral argument that the only things they were seeking precertification were systemwide policies, Hunter's and the opt-in plaintiffs' personnel files, and a *"class list,"* this Court denied Legacy's motion for a protective order to limit the scope of Hunter's numerous remaining, broadly crafted discovery requests. (ECF 52 at 8-9.) The Court concluded that: "At minimum, Hunter should be able to glean from the individuals disclosed [after a *Belaire* process] whether the violative conduct alleged is a practice that is unique to the demands of intensive care units, or whether the problem extends across a broad spectrum of units and positions." (*Id.* at 16.) Only then would further precertification discovery potentially be warranted. (*Id.*)

After the Court entered its order, it took the parties several months to reach agreement on what job positions fell within Hunter's nebulous definition of "nursing staff" for purposes of the random sample of employees. (Peck Decl. ¶¶ 4-5; *id.* Ex. 4.) The parties engaged in extensive back-and-forth to address what positions constituted "nursing staff"—for instance, Hunter sought to include as "nursing staff" all "safety and security" classifications, including job titles such as Safety Security Officer and Safety Security Dispatcher. (*Id.* ¶ 6; *id.* Ex. 4 at 5-6.) The *Belaire-West* process thus took place from January through March 2020, with plaintiff's counsel ultimately receiving the final employee list on March 9. (Peck Decl. ¶ 7, Ex. 5.) Around 100 employees opted out of having their names and contact information delivered to them, meaning that Hunter received the names and contact information of around 500 current and former "nursing staff" who had ever worked at Emanuel or Randall.[4] (*Id.* ¶ 7.) The employee list also specified whether they had worked at any other Legacy facility (95 of whom had). (*Id.*)

---

[4] Specifically, the parties agreed to include: Registered Nurses, Licensed Practical Nurses, NICU Technicians, Emergency Room Technicians, Lead Surgical Technologists, Certified Nursing Assistants, and Behavioral Health Therapists.

7-  Defendants' Opposition to Plaintiff's Motion for
    Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

148459293. 6

Since March 8, 2020, Hunter has added 19 opt-in plaintiffs to the 6 opt-in plaintiffs who had already joined. Though the employee list Hunter received had the names and contact information for Registered Nurses, CNAs, NICU Technicians, Lead Surgical Technologists, Behavioral Health Therapists, and Emergency Room Technicians, the vast majority of the opt-in plaintiffs (22 out of 25) only ever worked as Registered Nurses at Emanuel and Randall. (Logsdon Decl. ¶ 13.)

Hunter and seven of the opt-in plaintiffs—plus one former Registered Nurse at Legacy Emanuel who is not an opt-in plaintiff and did not work at any Legacy facility during the Proposed Collective period—have filed declarations in support of this motion for conditional certification. (*Compare* ECF 80-81, 83-88, *with* ECF 82.) Though drafted to be as similar as possible to one another, the eight opt-ins' declarations demonstrate that there are material differences even among such a small group of mostly Registered Nurses, most of whom only worked at Emanuel and Randall during the Proposed Collective period.[5] Because even these eight opt-in plaintiffs are not similarly situated, this Court should deny—or in the alternative, substantially limit—conditional certification of a collective action under FLSA.

# Argument

## I.    Conditional certification should be denied because the proposed collective of plaintiffs is not similarly situated in ways that are material to the resolution of their claims.

To maintain a collective action, plaintiffs must demonstrate that they are "similarly situated" for purposes of the FLSA. 29 U.S.C. § 216(b). To be "similarly situated," plaintiffs must demonstrate that they and all of the potential plaintiffs were "victims of a common policy or plan that violated the law." *Goudie v. Cable Comms., Inc.*, 2008 WL 4628394, at *3 (D. Or. Oct. 14, 2008).

---

[5] Noah Jacobson's declaration should be disregarded as irrelevant to conditional certification given that he did not work at any Legacy facility during the Proposed Collective period and is not an opt-in plaintiff. (ECF 82.) Similarly, Elsie Dreese may have worked as a Registered Nurse at Legacy Meridian Park and as a pediatric oncology trial nurse at Emanuel, but her experiences at those hospitals and in those positions was far before the Proposed Collective period and are thus irrelevant to conditional certification. (ECF 80.)

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Though plaintiffs and potential plaintiffs need not be identical, *id.*, just "*any* similarity" between them is not enough, *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1114 (9th Cir. 2018). Instead, there must be "a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* "If there is no single decision, policy, or plan that affects the plaintiffs, the case will have enormous manageability problems." *Straka v. Methodist Dallas Med. Center Auxiliary,* 2018 WL 1611865, at *2 (N.D. Tex. Apr. 3, 2018) (omissions).

Evaluation of the "similarly situated" standard is typically a two-step process—first conditional certification, and then decertification. *Campbell*, 903 F.3d at 1100. Conditional certification results in notice being delivered to the potential members of the collective; decertification happens afterward, if it turns out after further discovery that the plaintiffs are not "similarly situated." *Id.* Courts apply different levels of scrutiny at the conditional certification and decertification stages, commensurate with the amount of discovery the parties have completed. *Id.*

Even though differing levels of scrutiny are applied, both stages largely involve "question[s] of case management," and are therefore the subject of "substantial judicial discretion." *Id.* (omissions). When exercising that discretion at the conditional certification stage in particular, the court "has a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation" of potential opt-in plaintiffs. *Straka,* 2018 WL 1611865, at *2 (omissions). The court "need not [conditionally] certify the action and facilitate notice where … it would inevitably decertify the action" shortly thereafter. *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at *10 (W.D.N.C. Sep. 16, 2011).[6]

---

[6] Contrary to Hunter's assertions, though this Court "need not … consider" evidence presented by Legacy, there is no prohibition against it doing so. *See Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1203 (N.D. Cal. 2013) (courts "need not even consider" defendants' evidence on conditional certification). *See also Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 941-42 (D. Minn. 2009) (in case where plaintiff proposed a broad collective and had no direct evidence of how purported companywide policy applied to every proposed collective member, court rejected

9-   Defendants' Opposition to Plaintiff's Motion for
     Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

**A.    This Court should apply the intermediate "modest plus" standard to evaluate whether Hunter, the opt-in plaintiffs, and the Proposed Collective are similarly situated to one another.**

In most cases, very little discovery has occurred before the plaintiffs move for conditional certification, so their motions are supported by the pleadings, a few declarations, and nothing else. *Goudie*, 2008 WL 4628394, at *3. In those circumstances, the court applies a "lenient" standard, requiring only a "modest factual showing" that the plaintiffs are similarly situated and refraining from reviewing the merits of the plaintiffs' claims. *Id.* Later, at the decertification stage, courts in the Ninth Circuit review the plaintiffs' claims using a summary judgment standard, determining whether the facts, as borne out in discovery, support the plaintiffs' initial untested theory that they are similarly situated. *Campbell*, 903 F.3d at 1117.

When a fair amount of discovery has taken place before the plaintiff moves for conditional certification, however, courts often apply an intermediate level of scrutiny. *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 822-27 (N.D. Ohio 2011). Indeed, after analyzing several approaches courts have taken in these circumstances, the *Creely* court required the plaintiffs—who had engaged in a little over three months of limited discovery, using that time to take a few depositions and obtain the defendant's written meal break policies—to make a "modest 'plus' factual showing." *Id.* at 827. It did so to prevent the "absurd result of granting the parties time to do discovery on the conditional certification question but subsequently imposing no incremental hurdle in determining whether [the p]laintiffs may send opt-in notices," rendering "the entire exercise of limited discovery … meaningless." *Id.*

The modest "plus" factual showing the *Creely* court required was thus: The "[c]ourt will compare [the p]laintiffs' allegations set forth in the Complaint with the factual record assembled through discovery to determine whether [the p]laintiffs have made sufficient showing beyond their

plaintiff's request for court to ignore defendant's evidence); *Creely v. HCR Manorcare, Inc.*, 789 F. Supp. 2d 819, 827 (N.D. Ohio 2011) (considering plaintiffs' arguments "in conjunction with [d]efendants' evidence").

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

original allegations that would tend to make it more likely that a class of similarly situated employees exists." *Id.* In other words, the court analyzed whether the plaintiffs had "advanced the ball down the field—showing that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs." *Id.* The court would make that evaluation "in conjunction with [the d]efendants' evidence and in the context of [the p]laintiffs' unshifting burden to prove their claims," but would still not "weigh the relative merits of the parties' claims." *Id.*

This Court should adopt the intermediate, modest "plus" standard as framed by the *Creely* court. Hunter filed this lawsuit nearly a year and a half ago. (ECF 1.) At the Rule 16 conference with the Court, Hunter's counsel requested the opportunity to conduct limited discovery before moving for conditional certification. (Peck Decl. ¶ 3.) They have since received 12,065 pages of: Legacy's written policies and procedures applicable to plaintiffs' claims; Legacy's wage and hour training materials; job descriptions applicable to all positions that might be considered "nursing staff"; Legacy's organizational charts; Hunter's and several of the opt-ins' personnel files, timekeeping records, and payroll records, and; overtime logs and work schedules from the Randall PICU applicable to all Registered Nurses in that unit from December 2012 through December 2018. (Peck Decl. ¶ 9.) On top of that, Hunter has received an employee list. (*Id.* ¶ 7.) All employees who were included in the random sample were sent a *Belaire-West* notice informing them of this lawsuit and providing them with plaintiff's counsel's contact information—meaning, for over three months now, those employees could have contacted plaintiff's counsel and plaintiff's counsel could have contacted the approximately 500 of them who did not opt out. (*Id.*)

Given the length of time this case has been pending and the amount of discovery that has already taken place, it makes good sense to hold Hunter to the modest "plus" standard, requiring her to demonstrate that she has advanced the proverbial ball past her Complaint. But even if the Court does not adopt that standard, the significantly overbroad Proposed Collective does not satisfy the "similarly situated" requirement under the usual lenient standard.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

**B.     Hunter and the opt-in plaintiffs' own declarations and evidence demonstrate that the Proposed Collective is not similar in ways material to the resolution of their claims.**

Hunter and the opt-in plaintiffs have not only failed to advance the ball since the filing of the Complaint; they have started playing a different ball game altogether. That is, the central theory underlying Hunter's claim that she is similarly situated to all nursing staff—that Legacy used an auto-deduct timekeeping system—proved to be factually untrue. (Logsdon Decl. ¶¶ 6-7.) Legacy switched to an active clocking system on June 14, 2015, well over three years before Hunter filed her Complaint. (*Id.*; *see generally* Compl. (ECF 1).) The result is that, for the entire Proposed Collective period, nursing staff who clocked out for meal breaks but were interrupted at any time during those 30 minutes, were required to clock back in and were compensated for that missed meal period and any overtime that may have resulted from it. (Logsdon Decl. ¶ 7, Exs. C-D.)

Faced with that fact (which should have come as no surprise, given that Hunter herself used the active clocking system from June 14, 2015 until she was terminated in April 2016), Hunter has now changed theories. She now claims that Legacy has a systemwide policy or practice of violating its own written policies because it instructs nursing staff to put patient care first and because Registered Nurses' own ethical obligations—imposed not by Legacy, but by virtue of their licenses—require them to put patient care first. According to Hunter, this "patient care first" policy translates to a systemwide mandate for nursing staff to be available and subject to interruption during their meal breaks. Therefore, even if they are not actually interrupted during their meal breaks, they are still on duty because there is a chance they may be interrupted. Aside from that central theory, Hunter still claims that Legacy maintains a systemwide policy or practice of requiring nursing staff to arrive at work early and leave work late, but not to clock in before their scheduled shift starts and not to clock out after their scheduled shift ends. And, because Legacy requires nursing staff to obtain approval for overtime hours worked, the overtime they incur from missed meals or pre- or post-shift work may not be approved.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

As explained above, for purposes of a collective action, "what matters is not just *any* similarity between the party plaintiffs, but a legal or factual similarity **material** to the resolution of the party plaintiffs' claims." *Campbell*, 903 F.3d at 1115 (bold emphasis added). Thus, they must show that there is a "factual basis beyond the mere averments in their complaint" that there is a common thread between them that is material to reaching the conclusion that they were all subject to a common policy or practice that violated the FLSA. *Norman v. Dell*, 2008 WL 2899722, at *5 (D. Or. July 10, 2008) (omissions). Even assuming that any of Hunter's theories constitute an *unlawful* policy or practice (which they do not), Hunter and the opt-in plaintiffs' own factual assertions cut against a finding that these policies are common amongst the eight of them, let alone every member of nursing staff at every Legacy hospital, primary care clinic, specialty care clinic, and urgent care clinic.

> 1.    **Hunter's theory that the Proposed Collective remained on duty during unpaid, uninterrupted meal breaks requires a fact-laden inquiry, and Hunter's own evidence demonstrates that they are not similarly situated with respect to the facts material to resolving their claim.**

Hunter contends that she and the Proposed Collective were required to remain on duty and subject to interruption during all meal periods to such an extent that, even when their meal periods were not actually interrupted, the time was not their own. The specific ways in which she and the opt-in plaintiffs claim this violation occurred are different—e.g., some were on duty because they had to carry mobile communications devices; some were on duty because they had to remain on the premises; and so on. Those differences matter to this particular legal theory.

Whether employees remain on duty during otherwise uninterrupted meal breaks is a fact-driven inquiry under the "predominant benefit" test. *See Armour & Co. v. Wantock*, 323 U.S. 126 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Under that test, an employee's time is "work" for the purposes of the FLSA if it is spent "predominantly for the benefit of the employer." *Armour*, 323 U.S. at 133. The Court clarified that, in some cases, the "[f]acts may show that the [employee]

13-  Defendants' Opposition to Plaintiff's Motion for
     Conditional Certification

148459293. 6

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

waited to be engaged" and was therefore not working. *Skidmore*, 323 U.S. at 137-38. As a result, the Court emphasized the need to engage in a case-by-case analysis, taking a "practical approach based on the realities of each case." *Armour*, 323 U.S. at 133.

The predominant benefit test is consistent with the Department of Labor's regulations, which call for a fact-driven inquiry to determine whether a meal period is bona fide. 29 C.F.R. § 785.19. For instance, "30 minutes or more" is "ordinarily" long enough to count as a meal break, but "a shorter period may be long enough under special conditions." *Id.* And, "an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating," but it is also "not necessary that the employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period." *Id.* In other words, there is no bright line and each case turns on the specific mix of facts before the court.

Indeed, because of this fact-laden inquiry, cases that present different facts, unsurprisingly, have led to different outcomes under the predominant benefit test. For example, machine maintenance workers did not receive bona fide meal breaks when: they all testified that they had to remain on the premises during their meals; many of them testified, on top of that, they were required to carry their maintenance tools and an employer-issued mobile device during meal breaks, and; even when their meal was not actually interrupted by maintenance issues, their supervisors still often used meal periods to discuss their afternoon work schedules. *Bernard v. IBP, Inc. of Nebraska*, 154 F.3d 259, 262-63 (5th Cir. 1998). By contrast, sheriff's deputies received bona fide meal breaks even though they could be, and occasionally were, interrupted to respond to emergencies. *Lee v. Coahoma Cnty., Miss.*, 937 F.2d 220, 225 (5th Cir. 1991). Similarly, emergency medical services workers who were subject to the exact same requirements during meal breaks as they were during normal working hours—namely, that they could be anywhere within their 82-mile radius, could be interrupted to respond to emergencies at any time, and would be required to respond to those

14- Defendants' Opposition to Plaintiff's Motion for
    Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

emergencies within two minutes—were also deemed to have received bona fide meal breaks under the FLSA. *Roy v. Cnty. of Lexington, S.C.*, 141 F.3d 533, 545 (4th Cir. 1998).

*Straka v. Methodist*, a case on which Hunter heavily relies, is also instructive. The *Straka* plaintiffs sought to certify a class of all nurses at Methodist's four hospitals in the same metropolitan area in and surrounding Dallas, Texas. 2018 WL 1611865, at *1. Methodist did not contest that the narrow proposed class of nurses was similarly situated with respect to their job duties and requirements. *Id.* at *4. Nor did it contest that all nurses at all four hospitals were subject to the same automatic deduction and attestation timekeeping systems. *Id.* at *5. In addition to those concessions, Methodist's Director of Human Resources admitted that all nurses in every department at every Methodist hospital were subject to the same policy of not paying nurses for meal breaks during which they were subject to interruption and expected to respond to patient needs. *Id.* The plaintiffs did not have much work to do after that—in light of the hospital's concessions and admissions, the court determined that there was a "reasonable basis" to conclude that all of the nurses were similarly situated. *Id.*

This case is not like *Straka*. Unlike the plaintiffs in *Straka*, Hunter seeks to conditionally certify a far broader class of all "nurses, nurse assistants, nurse aides, and other employees with similar job duties" at six hospitals, 27 primary care clinics, 90 specialty clinics, and 19 urgent care clinics spanning two states. Plf.'s Br. at 2 (ECF 78). Also unlike the plaintiffs in *Straka*—who presented one unified theory for why they were on duty during their uninterrupted meal breaks—Hunter and the opt-in plaintiffs put forth several reasons that they should be deemed on duty during their uninterrupted meal periods, and those reasons differ even amongst themselves. Some of the differences apparent on the face of their declarations are:

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

- Elsie Dreese and Julianne Hunter claim that they were required to carry Legacy-issued mobile communications devices, but the remaining declarants do not appear to have been required to do so;[7]

- Jennifer McElravy states that the Medical Acute Care Unit in which she worked attempted to relieve nurses by having another nurse temporarily cover their patient assignments, but even that was not enough to relieve her of her duties, because she could still be called at any time;[8]

- Jennifer McElravy and Cherlynn Miller allege that they would clock out during meal breaks as if they were taking a lunch, but would actually go back to work, in lieu of telling their managers that they were too busy to take a meal break; however, no other declarant alleges to have had that experience;[9]

- The Registered Nurse declarants claim to be subject to the American Nursing Association's ethical duties to put patient care first, which, according to them, necessarily translates to being on call during every minute of one's shift; Matthew Sullivan, a CNA, is not bound by those same purported ethical duties;[10]

- Many of the declarants allege that they frequently worked through or were interrupted during meal breaks, but Signe Lennox (a current employee) claims that she only "occasionally" works through meal periods and "used to be" frequently interrupted during attempted meal breaks (suggesting she is no longer subject to frequent interruptions).[11]

Finally, unlike the defendant's HR director in *Straka*, no one from Legacy has testified that all

nurses, nurse aides, nurse assistants, and employees with similar responsibilities at all of Legacy's

---

[7] Dreese Decl. ¶ 7 (ECF 80); Hunter Decl. ¶ 6 (ECF 81). Hunter points to Legacy's recognition, in one of its Frequently Asked Questions documents for managers and employees, that carrying a mobile communications device during a meal time does not on its own, render the employee on duty. Even if Legacy's interpretation were facially unlawful (which it is not), Legacy's mere statement of its interpretation as it applies to all hourly, non-exempt employees (including janitors and security officers) does not mean that Legacy requires all nurses, nurse aides, nurse assistants, and employees with similar duties to carry mobile communications devices with them during lunch. And as argued in this Part I.C.1, Hunter's own evidence shows that not all of her and the opt-in plaintiffs were required to carry mobile communications devices during their meal breaks.

[8] McElravy Decl. ¶ 6 (ECF 84).

[9] *Id.* ¶ 10; Miller Decl. ¶ 12 (ECF 85).

[10] *See* Cottrell Decl. Ex. C (ECF 79-3); Sullivan Decl. ¶ 2 (ECF 88). *See also* Jones Decl. ¶ 11; Hill Decl. ¶ 11.

[11] *Compare* Dreese Decl. ¶ 5 (ECF 80); Hunter Decl. ¶ 6 (ECF 81); McElravy Decl. ¶ 5 (ECF 84); Miller Decl. ¶ 9 (ECF 85); Petsche Decl. ¶ 5 (ECF 86); Smith Decl. ¶ 10 (ECF 87), *with* Lennox Decl. ¶ 7 (ECF 83).

16- Defendants' Opposition to Plaintiff's Motion for
Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

hospitals and outpatient clinics are subject to a policy of not being paid for breaks during which they were on duty, an admission that factored heavily into the *Straka* court's decision to conditionally certify a class. *See Straka*, 2018 WL 1611865, at *5.[12]

In summary, Hunter argues that the Proposed Collective is similarly situated because they are subject to a uniform policy requiring them to remain on duty during unpaid, uninterrupted meal breaks. The declarations and other evidence she has submitted, however, demonstrate that, even amongst the eight opt-in declarants, there is no "legal or factual similarity material to the resolution" of their claims, because their claims cannot be "advance[d] …, collectively, to some resolution." *Campbell*, 903 F.3d at 1115. Though their general legal question might be the same—whether the Proposed Collective's meal breaks were predominantly for Legacy's or their benefit—that legal question is fact-dependent. *Armour*, 323 U.S. at 133. To be sure, the **potential** for factual dissimilarities has not necessarily proved to be a barrier to conditional certification. But when Hunter and the opt-in plaintiffs' own evidence in support of conditional certification puts these material differences on full display, conditional certification ought to be denied. *See Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 942 (D. Minn. 2009) (denying conditional certification when the plaintiffs' declarations showed varying reasons why they did not receive pay for missed meal breaks).

---

[12] The remainder of the long list of cases Hunter cites as being factually similar to this one are also distinguishable. Plf.'s Br. at 25-28 (ECF 78). Some involved allegations of an auto-deduct policy, where the employees were frequently interrupted during meal times and the employer made the process for claiming missed meals so opaque that employees and managers did not understand it. *E.g.*, *Potoski v. Wyo. Valley Health Care Sys.*, 2013 WL 6731035, at *4 (M.D. Pa. Dec. 19, 2013). Aside from being distinguishable based on the theory presented, many involved much narrower proposed classes than Hunter seeks here. *E.g.*, *Brown v. Permanente Med. Grp. Inc.*, 2017 WL 1536493 (N.D. Cal. Mar. 2, 2017) (class limited to "advice nurses" at one call center). Several other of the cases included in Hunter's list are distinguished in Part I.C.3, *infra*.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

2.    **Hunter's remaining theories regarding how the Proposed Collective is similarly situated for purposes of the FLSA are also contradicted by her own evidence.**

Hunter also contends that the Proposed Collective is similarly situated because (1) they are subject to a uniform policy requiring them to perform off-the-clock work before and after their shifts, and (2) they are subject to a uniform policy requiring them to seek approval for overtime hours and permitting Legacy's managers to reject compensation for overtime hours actually worked. Hunter's and the opt-ins' declarations and other evidence refute these claims, as well.

First, with respect to the off-the-clock work claim, Hunter does not appear to rely on any of Legacy's written policies. Instead, she relies on her and the opt-in plaintiffs' declarations to attempt to establish that there is a reasonable basis to conclude this policy exists and is applied to the whole Proposed Collective. Yet three of the eight opt-in declarants make no mention whatsoever of this supposed uniform policy. (*See* Declarations of E. Dreese, S. Lennox, & D. Petsche (ECF 80, 83, 86).) Those three opt-in declarants do not contend to have been required to arrive to their shifts early; they do not contend to have stayed late; and they do not contend that they performed any work before clocking in or after clocking out. Though Hunter has provided a small sample of opt-ins, it is nevertheless telling that nearly one-third of them—who all worked at Emanuel and one at Legacy Silverton Medical Center—do not allege to have been subject to the very policy they contend is applied to Proposed Collective members systemwide.

Second, with respect to overtime, Hunter does cite Legacy's systemwide policy and guidance, though she omits material portions of it. That is, she contends that Legacy's policy is facially unlawful because it requires employees to seek approval for overtime hours and that, under this written policy, "supervisors may and do deny the unapproved overtime hours when submitted via meal period cancellations." *See* Plf.'s Br. at 21-22 (ECF 78) (purporting to describe LEH00001900, Legacy's "Compensation & MyTime Frequently Asked Questions" guidance document).) She further contends that "[t]his policy discourages employees from receiving payment to which they are

entitled for their work, and gives Legacy a way to unjustly deny overtime compensation." *Id.* at 22. Notably, Hunter cites no support whatsoever for her assertions that employees who work overtime without seeking approval are or may be denied overtime compensation. That is likely because the very FAQ document she cites for the general policy requiring overtime approval clarifies in multiple places that unapproved overtime must still be compensated. For instance, Legacy prohibits supervisors from changing an employee's clock-in or clock-out times to avoid overtime:



(Logsdon Decl. Ex. D, at LEH00001898.) Just a couple of pages later, it requests that employees seek approval for overtime work and then clarifies that they will be paid for overtime hours worked, regardless of whether they are approved:



(*Id.* at LEH00001900.) Contrary to Hunter's arguments, Legacy's written policy and guidance clearly prohibits refusing to compensate employees for overtime hours worked.

It does not appear that Hunter contends that a requirement to seek overtime approval, in and of itself, is unlawful under the FLSA. Nor do her or any of the opt-in declarants allege that they were denied overtime approval when they requested it. Instead, three of the eight opt-in declarants

19- Defendants' Opposition to Plaintiff's Motion for
    Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

contend that there were times they did not request overtime pay because they did not want to ask their managers for approval. (ECF 85, 87, & 88 (Miller, Smith, & Sullivan Decls.).) The other five declarants do not even mention the overtime pre-approval requirement, much less how that requirement resulted in them not seeking or being compensated for overtime hours worked.

Hunter has made neither a modest "plus" nor a modest factual showing that the Proposed Collective was uniformly subject to unlawful policies requiring off-the-clock and uncompensated overtime work. Her request for conditional certification on these theories should be denied.

> **3.    Given the material disparities between Hunter and the opt-in plaintiffs' own experiences, this Court should deny conditional certification of the Proposed Collective.**

It is not surprising that Hunter and the opt-in plaintiffs' own declarations belie their claims. Legacy has consistently maintained that the Proposed Collective is far too broad, and Hunters' and the opt-ins' experiences far too narrow, to justify collective treatment. Now, the Court need not rely on Legacy's well-founded assertions—Hunter and the opt-in plaintiffs themselves have made Legacy's point. As this Court as recognized, "[i]n determining whether a potential class is similarly situated, courts have rejected conditional certification where the class is too broad, or the duties of the different class members are too varied." *Goudie v. Cable Comms., Inc.*, 2008 WL 4628394, at *7 (D. Or. Oct. 14, 2008).

Hunter has received the names and contact information of around 500 current and former Registered Nurses, CNAs, NICU Technicians, Lead Surgical Technologists, Behavioral Health Therapists, and Emergency Room Technicians who worked at Emanuel and Randall. Legacy also identified around 95 of those employees who worked at Legacy facilities other than Emanuel and Randall. And Hunter has had around 18 months to otherwise investigate her claims. Still, she has presented nine declarations (one from a former Legacy nurse who did not work at Legacy during the Proposed Collective period) from eight Registered Nurses and one CNA. All of those declarants worked at Emanuel and Randall, one Registered Nurse worked in one unit at Legacy Silverton

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Medical Center, and the one CNA worked in one unit at Good Samaritan and Emanuel. Hunter presents no evidence regarding Legacy's numerous outpatient clinics. She presents no evidence regarding the Legacy Meridian Park, Legacy Mount Hood, or Legacy Salmon Creek Medical Centers. She presents no evidence regarding positions other than Registered Nurse or CNA (and the evidence regarding even those two positions demonstrates the differences between them).

Hunter has also not addressed specific concerns this Court identified in its discovery order. As this Court explained: "the conduct complained of appears to be a function of Hunter's specific job in any one of three intensive care units. There, nurses must constantly attend to the needs of medically vulnerable patients, so much so that the demands of the job could reasonably interfere with a 30-minute meal break. Hunter presents no evidence that other, less involved units, or other types of facilities, face the same kind of demands which necessitate nurses staying on-call during their meal breaks." (ECF 52 at 15.) The Court continued: "Indeed, it is difficult to imagine the day-to-day operations of a regular specialty clinic requiring the constant care and attention that is essential to the operation of an intensive care unit in a Level 1 trauma center like Emanuel. Furthermore, Hunter has provided no evidence to demonstrate that the job duties of individuals in various positions across a variety of facilities are likely to be similar to that of an intensive care RN. Hunter provides no explanation, for example, how a nurse aide working in physical therapy and an intensive care RN might have job duties similar enough to warrant expanding discovery outside of the facility in which she worked." (*Id.*) Given that Hunter has not "advanced the ball" in addressing these concerns, and has not even attempted to make a factual showing regarding some of them, this Court should deny conditional certification of the Proposed Collective.

At the least, if the Court is inclined to certify a collective action under the lenient conditional certification standard, it should significantly narrow the scope of the Proposed Collective. There is support for this approach in cases Hunter herself relies on. For instance, Judge Peebles narrowed three different proposed collective actions to the hospitals in which the opt-in declarants worked

21-  Defendants' Opposition to Plaintiff's Motion for
     Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

and to specific job duties, citing the need to take a "measured approach when addressing a request for conditional certification, mindful of the potential burden associated with defending against an FLSA claim involving a broadly defined collective group of plaintiffs." *Colozzi v. St. Josephs Hosp. Health Center*, 595 F. Supp. 2d 200, 207, 209 (N.D.N.Y. 2009); *Fengler v. Crouse Health Found., Inc.*, 595 F. Supp. 2d 189, 196-197 (N.D.N.Y. 2009); *Hamelin v. Faxton-St. Luke's Healthcare*, 2009 WL 211512, at *6-8 (N.D.N.Y. Jan. 26, 2009). Similarly, the court in *Hintergerger v. Catholic* narrowed the scope of the plaintiffs' proposed collective action to the specific job titles and work locations of the declarants, reasoning that "[i]t is up to the lead Plaintiffs to identify some factual nexus" that binds their proposed collective together, and they had not done so with respect to the broad class they had proposed. 2009 WL 3464134, at *6-7 (W.D.N.Y. Oct. 21, 2009).

Following that same approach, the Court should first limit the Proposed Collective to Registered Nurse positions. As described above, Hunter's evidence shows that only Registered Nurses are subject to the American Nursing Association's ethical rules. Thus, even though she has submitted a declaration from one CNA, that CNA is not subject to the same ethical requirements that Hunter purports give rise to Registered Nurses' obligations to remain on duty at all times. In any event, a declaration from one CNA who worked in one unit at Emanuel and Randall is not sufficient to show a systemwide policy, just as Hunter's Complaint, on its own, was not enough to support her classwide allegations. It is "up to the lead Plaintiffs to identify some factual nexus" among the job titles they seek to include in their Proposed Collective, and Hunter has failed to do so.

Second, this Court should limit the scope of the Proposed Collective to Emanuel and Randall. The one CNA's declaration is not sufficient to give rise to a theory that all Registered Nurses (or even CNAs) at Good Samaritan were subject to uniform unlawful practices. Nor is the one Registered Nurse's declaration regarding Legacy Silverton Medical Center sufficient to represent

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

all of the Registered Nurses who work there. Again, Hunter has not identified a factual nexus among the 100-plus facilities she seeks to include in their Proposed Collective.[13]

At a minimum, then, this Court should exercise its discretion to narrow the Proposed Collective.

## II.    If the Court grants conditional certification, it should modify Hunter's proposed form of notice because it is misleading and fails to apprise potential plaintiffs of their rights and risks.

District Courts usually choose to control the notice process. *See Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Court-facilitated notice ensures that the form, content, and methods of distribution are timely, accurate, neutral, and informative. *See id.* at 171-72. Therefore, if this Court conditionally certifies a collective action, it should exercise its authority to reign in the overbroad notice proposed by Hunter. Specifically, the proposed 120-day period for opting in is too long, the included opt-in form itself is confusing, and potential opt-in plaintiffs deserve to be advised that if they opt-in to the lawsuit, they bear all the risks and obligations that a plaintiff ordinarily bears, like the obligation to participate in discovery and the risk that attorney fees will be assessed against them.

The 120-day opt-in period Hunter seeks is far too long. Long opt-in periods are appropriate when defendants have employees spread across the country. By contrast, the notice here will, at most, go to employees in this and a neighboring state. Legacy suggests that a 60-day opt-in period is more appropriate. *See* Hintergerger, 2009 WL 3464134, at *12 (60-day out-out period is typical for FLSA collective actions).

The proposed notice is confusing in its various descriptions of the relationship between any opt-in plaintiffs and plaintiff's counsel. Under heading "IV," for example, the proposed notice tells

---

[13] As will be explained below in Part III, this Court should limit the Proposed Collective in a third way, based on the time period that Hunter seeks to certify. Equitable tolling is improper in this case, and the statute of limitations for each opt-in plaintiff should stop running when that particular plaintiff consented to join the proposed collective action.

23-  Defendants' Opposition to Plaintiff's Motion for
     Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

potential opt-ins that they, "may designate the Named Plaintiff and her attorneys as [their] agents"
or "retain a different lawyer[.]" (ECF 79-1 at 2.) Yet under heading "VII," the notice informs all
recipients that if they "suspect any retaliation or discrimination," they should "immediately" call
plaintiff's counsel and speak to a lawyer. (ECF 79-1 at 3.) Compounding the issue, the proposed
consent to join the collective action wholly disregards any opt-in plaintiff's ability to choose another
lawyer. (EFC 79-2 at 2.) It purports to designate plaintiff's counsel as the opt-in plaintiff's lawyer for
all purposes. (EFC 79-2 at 2.) The proposed notice and proposed consent form should be changed
to remove any suggestion that an opt-in plaintiff must hire plaintiff's counsel.

Potential opt-in plaintiffs also deserve to know ahead of time the potential risks they face.
For instance, they may be required to participate in discovery. And, if Legacy ultimately prevails, it
may seek its attorney fees from opt-in plaintiffs. For that reason, courts often include a warning that
FLSA plaintiffs may be liable for attorney fees if their employer prevails. *See Santinac v. Worldwide
Labor Support of Illinois, Inc.*, 107 F. Supp. 3d 610, 618 (S.D. Miss. 2015) (requiring warning about
potential attorney fee exposure); *Behnken v. Luminant Mining Co., LLC*, 997 F. Supp. 2d 511, 524
(N.D. Tex. 2014) (same).

Finally, plaintiff's counsel seek the social security numbers for every member of the
Proposed Collective. Legacy requests that the Court deny their request for that information, which is
unnecessary to effect notice and constitutes an unreasonable invasion of Legacy's employees' privacy
interests. *See Goudie*, 2008 WL 4628394, at *9 (denying plaintiff's request for collective members'
social security numbers).[14]

---

[14] Legacy also requests that this Court deny Hunter's request to have Legacy deliver a
"computer-readable database" of the collective members' information. Legacy is, of course,
amenable to delivering any list of employees in a usable electronic format, but delivery of a
"database" is burdensome and beyond what is required of Legacy.

24- Defendants' Opposition to Plaintiff's Motion for
Conditional Certification

148459293. 6

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

**III.    Hunter is not entitled to equitable tolling because run of the mill litigation delays—including delays attributable to Hunter alone—do not justify setting aside the statute of limitations.**

The equitable tolling Hunter asks for is not appropriate in this case because plaintiff's counsel have only their own lack of enthusiasm to blame for any statute of limitations problem. A litigant is entitled to equitable tolling of a statute of limitations if and only if the litigant establishes two elements: (1) that she has been pursuing her rights diligently, and (2) that some extraordinary circumstance beyond her control stood in her way and prevented timely filing. *Menominee Indian Tribe of Wisconsin v. U.S.*, 136 S. Ct. 750, 755-56 (2016). Because "the circumstances of a case must be 'extraordinary' before equitable tolling can be applied," *Holland,* 560 U.S. at 652, courts grant equitable tolling only "sparingly," *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96 (1990). *See Wallace v. Kato,* 549 U.S. 384, 396 (2007) ("a rare remedy"). This is not one of those rare cases.

Setting aside the legal merits of Hunter's equitable tolling claim for a moment, her request for tolling all the way back to March 22, 2016, is clearly an overreach. That date is tied to March 22, 2019, the day Hunter first **served** discovery requests on Legacy. (Peck Decl. ¶ 2.) By operation of the Federal Rules of Civil Procedure, Legacy's responses to those discovery requests were not due until 30 days later. And by operation of the parties' later agreement, Legacy's discovery responses were not due until June 5, 2019. (Peck Decl. ¶ 2, Ex. 1.) Asking for tolling dating back to two-and-a-half months before Legacy's discovery responses were even due is, put simply, unreasonable.

Hunter also disregards the very nature of how litigation works. As this Court has recognized, "the normal course of litigation is time consuming." *Goudie*, 2008 WL 4861649, at *3. It is normal for a party to object to producing documents, especially when discovery requests are as broadly drafted as Hunter's are. Indeed, Legacy was justified in objecting to producing the broad "class list" that Hunter requested—after competing motions practice, this Court agreed with Legacy that producing a list of the names, last-known address, last-known phone number, last-known email address, dates of employment, employment location, and social security number for all Legacy

Registered Nurses, nurse assistants, nurse aides, medical assistants, and various kind of technicians spread across six hospitals and over a 100 clinics all the way back to 2012, a list that would have included around 5,000 employees. (ECF 43-1 at RFP Nos. 13 & 14.) Legacy attempted to confer with Hunter's counsel about the scope of that request, but they would not budge. (Peck Decl. ¶¶ 3-4.) Taking that position was Hunter's right. But it was also Legacy's right to avoid the undue burden and invasion of employee privacy that Hunter's disproportional requests would have imposed. The litigation surrounding this issue is hardly an extraordinary circumstance.

Hunter may also argue that Legacy failed to produce the random sample of employees for the *Belaire-West* notice and opt-out process by October 24, 2019, the date ordered by this Court. That may be so, but Hunter's counsel's own decisions substantially contributed to that delay. Given the parties' disagreement about what job titles plaintiff's unclear definition of "nursing staff" included, Legacy provided Hunter a list of all historical and current job titles that are or were filled at Emanuel and Randall dating back to 2012. (Peck Decl. Ex. 4 at 6-7, Ex. 6 at 45.) It provided Hunter that list before the Court-imposed deadline and requested that plaintiff's counsel identify the job titles they believed were appropriate to include in the sample. (*Id.*) Despite Legacy's attempts to follow-up, Hunter's counsel did not respond with their proposal until four days after the Court's deadline, on October 29, 2019. (*Id.* Ex. 4 at 5-6.) Even then, Hunter's position about what job titles should be included was far beyond any reasonable interpretation of what "nursing staff" would include: they sought the names and contact information for Safety Security Classifications and Equipment Supply Specialists. (*Id.*) Taking that position led to further negotiation. (*Id.* Ex. 4 at 1-5.)

Once the parties had finally reached agreement about which job titles would be included in the random sample[15] and Hunter's counsel had provided the contact information for the notice

---

[15] Though Legacy sought to work cooperatively with plaintiff's counsel and reach an agreement about the job titles that could potentially be viewed as "nursing staff," Legacy did not concede that employees who filled those positions actually were "nursing staff" or were similarly situated to Hunter in any way. The job titles selected for inclusion in the random sample, then, ought not dictate the scope of any collective action that may be certified.

26- Defendants' Opposition to Plaintiff's Motion for
       Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

148459293. 6

administration vendor on December 20, 2019, Legacy provided the employee list to the vendor within six business days (accounting for the two intervening holidays), on January 3, 2020. (Peck Decl. ¶ 7, Ex. 4 at 1.) It then took about one month for the vendor to follow the parties' agreed process for randomizing the sample of employees, and the *Belaire-West* notice was mailed to the sample on January 30, 2020. (*Id.* Ex. 5.) On March 9, following the 30-day opt-out period, Hunter received the names, contact information, and dates and location(s) of employment for around 500 employees who had not opted out. (*Id.* Ex. 5 at 8-9.) In short, the *Belaire-West* notice and opt-out process did take time, but that was in large part due to Hunter's own tactical decision making and time spent on ordinary negotiations that occur during discovery. Again, that is no extraordinary circumstance.

Finally, Hunter also complains that Legacy did not produce other discovery until March 18, 2020. Without belaboring the issue, Hunter knew, from both the parties' Rule 26(f) conference and Legacy's written discovery responses, that Legacy was not willing to produce its internal company policies or training materials, employee personnel files, or other documents responsive to Hunter's requests without entry of a protective order. (Declaration of Sarah J. Crooks in Support of Legacy's Opposition to Motion for Conditional Certification ("Crooks Decl.") ¶ 2; Peck Decl. Exs. 2-3.) Legacy's position was neither novel nor surprising. As a medical provider and corporation, it is reasonable for Legacy to anticipate that business confidential and HIPAA-protected information may appear in documents responsive to Hunter's overbroad requests. Indeed, during the Rule 26(f) conference, Hunter's counsel did not oppose entry of a protective order. (Crooks Decl. ¶ 2.) On March 26, 2019, shortly after that conference, Legacy sent Hunter's counsel a proposed draft protective order. Here is a brief summary of what happened next:

- **April 2019**: Legacy followed up with Hunter's counsel two times to ask if they had had a chance to review the draft protective order (via conferral call, followed up by email). Hunter's counsel responded that they would review it and "circulate [their] proposed edits as soon as possible." (Peck Decl. ¶ 8; Ex. 6, at 29.)

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

- **June 2019**: Legacy served its written discovery responses, many of which included a statement that Legacy was prepared to produce documents immediately or within one month, so long as the parties had reached agreement on a protective order and it had been entered by the Court. (*Id.* Exs. 2-3.)

- **July 2019**: Hunter's counsel delivered an entirely new draft of the protective order, not responding at all to Legacy's proposed draft. Legacy turned around another proposed revision, consenting to using Hunter's counsel's version of the protective order but adding a clawback provision under Rule 502(d). (Peck Decl. ¶ 8; Ex. 6, at 15-39.)

- **September 2019**: The Court held an in-person hearing on the parties' discovery motions. Following the hearing, counsel for Legacy asked Hunter's counsel about the revised draft protective order that Legacy had circulated in July, and Hunter's counsel responded by stating that they would respond to the most recent draft. (Crooks Decl. ¶ 3.)

- **October 2019**: Legacy twice asked Hunter's counsel about the draft protective order (via conferral call, followed up by email). Hunter's counsel responded a few days after Legacy's second inquiry. Hunter's counsel had removed the 502(d) clawback provision, stating it was unnecessary. Days later, Legacy responded to their concerns about the clawback provision and requested that they reconsider their position. (Peck Decl. ¶ 8; Ex. 6, at 44-45.)

- **March 2, 2020**: Hunter's counsel responded to Legacy's October 24 email and agreed to the protective order that Legacy had circulated in July. Hunter's counsel then demanded that Legacy produce "all responsive documents" by March 6, 2020. (*Id.* Ex. 6 at 43.)

- **March 11, 2020**: For the first time, Hunter's counsel argued that it was unreasonable for Legacy to wait to produce documents until a protective order had been entered. (*Id.* Ex. 6 at 40-41.)

- **March 12, 2020**: Hunter requested, again for the first time, that Legacy agree to toll the statute of limitations in light of the parties' "discovery dispute." The same day, the Court entered the Stipulated Protective Order. (*Id.* Ex. 7 at 8; ECF 60.)

- **March 18, 2020**: About a week later, following a brief delay after transitioning to a remote-work status in light of the COVID-19 pandemic, Legacy produced documents. (Peck Decl. ¶ 9; Ex. 7, at 1-5.)

In summary, asking for a protective order is no extraordinary external event; it is just a garden variety issue that nearly every complex civil litigation must confront. Hunter's counsel did

28- Defendants' Opposition to Plaintiff's Motion for
   Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

not oppose Legacy's general request for entry of a discovery protective order when initially requested or at any time in the year leading up to them agreeing to it. The first time Legacy learned that Hunter took issue with Legacy's position that it would not produce documents before a stipulated protective order was entered was when Hunter's counsel finally delivered the agreed-upon draft, nearly a year after Legacy had sent the first draft, and demanded that Legacy produce documents within a matter of days (a demand that in and of itself demonstrates that Hunter's counsel knew all along their failure to return the draft protective order was the only thing standing in the way of Legacy producing documents). Ultimately, plaintiff is responsible for diligently prosecuting her own case. The extreme remedy of equitable tolling should not rescue Hunter for her failure to do so.[16]

Legacy respectfully requests that this Court deny Hunter's request for equitable tolling.

## Conclusion

For the reasons explained above, Legacy respectfully requests that this Court deny Hunter's request for conditional certification. Alternatively, Legacy requests that this Court substantially limit the scope of Hunter's Proposed Collective. To the extent the Court conditionally certifies a collective, Legacy requests that the Court make the requested changes to the notice and consent forms. Finally, Legacy requests that this Court deny Hunter's request for equitable tolling.

---

[16] But perhaps that is all beside the point—plaintiffs in FLSA collective actions often move for conditional certification before any discovery has occurred, and they regularly prevail in those efforts (assuming there are actually members of their collective action as they have defined it). *E.g.*, *Carter v. Jackson-Madison Cnty. Hosp. Dist.*, 2011 WL 1256625, at *16 (W.D. Tenn. Mar. 31, 2011) (conditionally certifying collective action based on complaint and three affidavits before discovery had occurred, and collecting many cases that have taken a similar approach or even relied on the complaint alone).

29-  Defendants' Opposition to Plaintiff's Motion for
      Conditional Certification

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

DATED:  June 30, 2020                    PERKINS COIE LLP

                                         By:  */s/ Sarah J. Crooks*
                                              Stephen F. English, OSB No. 730843
                                              SEnglish@perkinscoie.com
                                              Sarah J. Crooks, OSB No. 971512
                                              SCrooks@perkinscoie.com
                                              C. Rian Peck, OSB No. 144012
                                              RPeck@perkinscoie.com
                                              1120 N.W. Couch Street, 10th Floor
                                              Portland, OR  97209-4128
                                              Telephone:  503.727.2000
                                              Facsimile:  503.727.2222

                                              *Attorneys for Legacy Health and Legacy Emanuel*
                                              *Hospital & Health Center*