UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JULIANNE HUNTER, individually and on
behalf of all others similarly situated,

               Plaintiff,

   v.

LEGACY HEALTH, LEGACY EMANUEL
MEDICAL CENTER, LEGACY
EMANUEL HOSPITAL & HEALTH
CENTER, LEGACY HEALTH PARTNERS,
LLC, RANDALL CHILDREN'S
HOPSITAL AT LEGACY EMANUEL,

              Defendants.

Case No.   3:18-CV-02219-AC

OPINION AND ORDER

_____

ACOSTA, Magistrate Judge:

*Introduction*

     Plaintiff Julianne Hunter ("Hunter"), individually and on behalf of others similarly situated,

brings this action against defendants Legacy Health, Legacy Emanuel Medical Center, Legacy

Emanuel Hospital & Health Center, Legacy Health Partners, LLC, and Randall Children's Hospital

Page 1  – OPINION AND ORDER

at Legacy Emanuel (collectively, "Legacy") under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (2018) ("FLSA") and Oregon law.  Hunter alleges Legacy failed to pay overtime compensation for automatic time deductions and "off-the-clock" work, failed to pay all wages due upon separation of employment, and took unlawful deductions from employee wages.

Hunter filed a Motion (ECF No. 78) for Conditional Certification Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Motion.")).  The court finds Hunter has met the lenient preliminary standard for conditional certification and grants the Motion as to conditional certification and notice, but denies that part of the Motion asking for equitable tolling.[1]

*Background*

Legacy is a nonprofit health system with facilities spread across southern Washington and the Willamette Valley in northern Oregon.  (Eve Logsdon Decl. in Supp. of Defs.' Opp'n to Pl.'s Mot., dated June 30, 2020, ECF No. 103 ("Logsdon Decl."), ¶ 2.)  Three of Legacy's hospitals, Legacy Emanuel Medical Center ("Emanuel"), Randall's Children's Hospital ("Randall"), and Legacy Good Samaritan Medical Center are regional hospitals serving patients from Oregon, Washington, and Idaho.  (*Id.* ¶ 3.)  Legacy's other hospitals are community hospitals, which serve patients locally.  (*Id.*)  Emanuel and Randall are on the same physical campus in Portland, Oregon.  (*Id.* ¶ 4.)  Legacy currently employs approximately 5,200 registered nurses ("RNs"), certified nursing assistants ("CNAs"), certified hospital technicians, and emergency department technicians.

Hunter worked at Emanuel and Randall as an RN from March 2009 to April 2016. (Julianne Hunter Decl. dated May 2, 2020, ECF No. 81 ("Hunter Decl."), ¶ 2.)  Legacy used the

---

[1] The parties have agreed to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).

L-Time timekeeping system for non-exempt employees from December 26, 2012 to June 13, 2015. (Logsdon Decl. ¶ 6.)   The system automatically deducted meal periods from an employee's shift after the employee worked six or more hours.   (Logsdon Decl., Ex. A, ECF No. 104-1, at 1.)   "If an employee works six (6) or more hours and is unable to take the 30-minute meal period, no lunch should be recorded while clocking out of their shift."   (*Id.*)   According to Legacy, "[t]he L-Time system was designed to recognize and give effect to hourly, non-exempt employees' right to take a 30-minute unpaid, uninterrupted meal break when working a shift of six hours or longer." (Logsdon Decl. ¶ 6.)

Under the L-Time system, "[i[f an employee works six or more hours, and, due to the nature or circumstances of the work, is required to remain on duty or perform any tasks during the 30-minute meal period," the employee should enter a special code to indicate the employee did not take a lunch break when the employee "badges out" at the end of the shift.   (Logsdon Decl., Ex. B, ECF No. 104-2 ("L-Time FAQ"), at 21.)   The employee would be paid for the interrupted meal period.   (*Id.* at 20.)   If an employee forgot to enter the special code at the end of a shift, then the employee was required to submit a Correction Form to a manager.   (*Id.* at 21.)

Under the L-Time system, if an employee was required to carry a pager during a meal period but was not paged, the employee was not paid for the time because the employee received an uninterrupted meal break.   (*Id.* at 23.)   Similarly, if an employee was required to remain on the premises during a meal period to be available to respond to a patient was not interrupted, the employee was not paid for the meal period.   (*Id.*)   The L-Time policy stated that "if an employee is not regularly able to be relieved of all duties," the employee "should bring this to the attention of the manager."   (*Id.* at 22.)

\ \ \ \ \

Page 3  – OPINION AND ORDER

On June 14, 2015, Legacy switched to the MyTime timekeeping system.  (Logsdon Decl.
¶ 7.)  The MyTime system does not automatically deduct meal periods from employee shifts.
(Logsdon Decl., Ex. D, ECF No. 104-4 ("MyTime FAQ"), at 17.)  Instead, the system requires
hourly, non-exempt employees "to clock in and out for meal breaks using a code designated for
meal periods."  (Logsdon Decl. ¶ 7.)  Thus, "[u]nlike the L-Time system, under the MyTime
system, hourly, non-exempt employees are automatically paid for their meal breaks unless they
clock out for a full, uninterrupted 30 minutes."  (*Id.*)  Legacy's MyTime policy states:  "If the
employee is required to remain on duty during the meal period or performs any tasks during the
meal period, the meal period must be paid, and the employee would not clock out."  (Logsdon
Decl., Ex. C, ECF No. 104-3 ("MyTime Policy"), at 2.)  If an employee's meal period is
interrupted and the employee is required to return to work, the employee should badge back in to
work and enter a special code.  (MyTime FAQ at 18.)

Like the L-Time system, the MyTime system stipulates that employees who are required
to carry pagers or remain on premises during meal breaks will not be paid for the meal break unless
the meal break is interrupted.  (*Id.* at 19.)  Employees who are "not regularly able to be relieved
of all duties" should speak to their managers or supervisors.  (*Id.*)

Legacy asserts that its policy prohibits hourly, non-exempt employees from performing
work "while off-the-clock" and that employees must seek approval for overtime.  (Logsdon Decl.
¶¶ 8, 9.)  Although Legacy may deny an employee's request to work overtime hours, "supervisors
are prohibited from denying approval for overtime hours already worked."  (*Id.*)  Managers
"have discretion to set their unit's practice regarding overtime work," and "some require nurses to
obtain approval to work overtime in advance; others don't."  (Linda Jones Decl. in Support of
Defs.' Opp. to Pl.'s Mot., ECF No. 102 ("Jones Decl."), ¶ 11.)

Page 4  – OPINION AND ORDER

Hunter contends she regularly worked more than forty hours per week, and was required to perform work before she clocked-in for work and after she clocked-out.  (Hunter Decl. ¶ 7.) Hunter asserts Legacy told her she could not clock-in before her scheduled start time or after her scheduled end time, even if she was required to work.  (*Id.* ¶ 8.)  Hunter estimates she worked, on average, fifteen minutes before she clocked in for a scheduled shift, and for thirty minutes after she clocked out.  (*Id.* ¶ 9.)  Hunter contends "this was a common and widely-known problem amongst the nursing staff, charge nurses, and supervisors at Legacy."  (*Id.*)

Hunter also asserts she was regularly interrupted when she attempted to take meal breaks. (*Id.* ¶ 12.)  Moreover, she claims Legacy "never trained nursing staff that we could reverse or correct the automatic meal deduction based on the mere fact that nursing staff were required to remain responsible for the health and safety of our patients."  (*Id.* ¶ 13.)

Hunter commenced this action on December 26, 2018.  She defines the FLSA collective members as "people who are or have been employed by [Legacy] as nurses, nurse aides, nurse assistants, and other similar hourly and non-exempt employees" working in either the United States or in the State of Oregon "that have been subject to an automatic time deduction by Defendants" within either the three years (FLSA) or six years (Oregon) preceding the filing of the complaint.  (Class and Collective Action Compl., ECF No. 1 ("Compl.") ¶¶ 13, 14.)

On July 23, 2019, both parties filed competing discovery motions.  (ECFs No. 39, 43.) Legacy sought a protective order to significantly limit the scope of discovery requested, and Hunter sought an order to compel production of class and collective lists to support certification.  (*Id.*) On September 30, 2019, the court ordered Legacy to provide Hunter with the name, job title, unit, last-known phone number, last-known email address, and dates of employment for a random sample of 600 individuals who worked at Emanuel or Randall during the relevant time period and

Page 5  – OPINION AND ORDER

met the definition of "nursing staff" by October 24, 2019.   (Op. and Order, ECF No. 52, 18.)

The parties took several months to reach an agreement on the process for selecting a random sample of employees.   (C. Rian Peck Decl. in Support of Defs.' Opp.'n to Pl.'s Mot. dated June 30, 2020, ECF No. 100 ("Peck Decl."), ¶ 7.)   On January 30, 2020, notice was mailed to 600 randomly selected employees.   (*Id.*)   Ninety-nine employees opted out of having their contact information shared with Hunter.   (*Id.*)

Legacy sent Hunter a proposed draft protective order on March 26, 2019.   (*Id.* ¶ 8.)   The parties reached agreement on a stipulated protective order on March 2, 2020.   (Peck Decl., Ex. 7, ECF No. 105-2, at 7.)   The court signed the protective order on March 13, 2020.   (ECF No. 62.)

On March 18, 2020, Legacy produced "397 documents, amounting to 12,065 pages." (Peck Decl. ¶ 9.)   The production included: Legacy's wage and hour polices; personnel files; timekeeping records; Legacy's new employee orientation materials; job descriptions; overtime logs from Randall; document retention policies; and organizational charts.   (*Id*.)

On May 20, 2020, Hunter filed the Motion.   Hunter contends "twenty-five potential Opt-In Plaintiffs have already submitted consent forms to join the lawsuit."   (Motion 2.)   Hunter seeks to notify "[a]ll current and former hourly non-exempt employees including, but not limited to, nurse, nurse assistants, nurse aids, and other employees with similar job duties employed by Defendants throughout the United States from March 22, 2016, until the resolution of this action (the 'Collective.')."   (*Id.*)

In support of the Motion, Hunter offers her declaration and the declarations from eight other current and former Legacy employees.   Each person stated he or she was interrupted during meal breaks.   (Elise Dreese Decl. dated May 8, 2020, ECF No. 80 ("Dreese Decl."), ¶ 5; Hunter Decl. ¶ 12; Noah Jacobson Decl. dated May 11, 2020, ECF No. 82 ("Jacobson Decl."),   ¶¶ 6, 9;

Signe Lennox Decl. dated May 15, 2020, ECF No. 83 ("Lennox Decl."), ¶ 9;   Jennifer McElvary

Decl. dated May 8, 2020, ECF No. 84, ("McElvary Decl."), ¶ 5; Cherlynn Miller Decl., dated May

14, 2020, ECF No. 85 ("Miller Decl."), ¶ 9; Diane Petsche Decl. dated May 15, 2020, ECF No. 86

("Petsche Decl."), ¶ 6; Shane Smith Decl. dated May 1, 2020, ECF No. 87 ("Smith Decl."), ¶ 11;

Matthew Sullivan Decl. dated May 11, 2020, ECF No. 88 ("Sullivan Decl."), ¶¶ 7-9.)   Several of

these declarants stated they were required to perform work before or after they had clocked in or

out for their scheduled shifts.   (Hunter Decl. ¶¶ 7-9; Jacobson Decl. ¶ 7; McElvary Dec. ¶ 8; Miller

Decl. ¶¶ 5, 6; Smith Decl. ¶¶ 6-8.)

Legacy offered declarations from the Chief Nursing Officers at Emanuel and Randall.

These declarations distinguish the responsibilities of RNs, CNAs, licensed practical nurses

("LPNs"), and technicians, making clear the greater and broader responsibilities of the RNs.   (Hill

Decl. ¶¶ 11-12; Jones Decl. ¶¶ 12-13).   First, RNs are bound by the American Nursing Association

ethical rules, while CNAs and LPNs are not.   (Hill Decl. ¶ 12.)   Second, RNs direct the nursing

care provided by LPNs and CNAs and directly supervise technicians.   (*Id.*)   Third, Legacy states

RNs are "ultimately responsible for implementing all aspects of the patient's plan of care" and for

consulting with the attending physicians.   (*Id.*)

According to Legacy, "shift-to-shift unit huddle[s]" occur at the beginning and end of

nurses' shifts.   (*Id.* ¶ 13.)   Although RNs, SNAs, LPNs, and technicians attend the huddles to

receive their assignments, "[t]here is no expectation that CNAs, LPNs, or technician's arrive

earlier than, or leave later than, their scheduled shift."   (*Id.*)   Legacy also contends CNAs, LPNs,

and technicians "are rarely (if ever) interrupted during their meal breaks" because "there is always

a Registered Nurse assigned to that patient who can cover the patient care needs during the CNA,

LPN, and Technician breaks."   (*Id.*)   Legacy states its policy prohibits employees from

Page 7  – OPINION AND ORDER

continuing to work after "badg[ing] out" at the scheduled end of a shift.   (L-Time FAQ at 25.)

*Legal Standard*

The district court has discretion to determine whether a collective action is appropriate. *Hargrove v. Sykes Enters.,* No. CIV. 99-110-HA, 1999 WL 1279651, at *3 (D. Or. June 30, 1999). *See also Adams v. Inter–Con Sec. Sys., Inc.,* 242 F.R.D. 530, 535 (N.D. Cal. 2007) ("The court's determination of whether a collective action is appropriate is discretionary.").   When deciding whether to conditionally certify a collective action, the court uses a fairly lenient standard. *McElmurry v. U.S. Bank Nat'l Ass'n*, No. CV 04-462–HU, 2006 WL 3908536, at *3 (D. Or. Dec. 8, 2006).

Section 216(b) of the FLSA ("Section 216(b)") authorizes employees to maintain an action against an employer for violations of the Act on behalf of the employee when the employees:   "(1) claim a violation of the FLSA, (2) are 'similarly situated,' and (3) affirmatively opt in to the joint litigation, in writing." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018). FLSA does not define "similarly situated."   *See* 29 U.S.C. § 216(b) (2018); *Campbell*, 903 F.3d at 1100.   However, the Ninth Circuit has held, "it is now the near-universal practice to evaluate the propriety of the collective mechanism — in particular, plaintiffs' satisfaction of the 'similarly situated' requirement — by way of a two-step 'certification process.'" *Id.*   First, "plaintiffs will, at some point around the pleading stage, move for 'preliminary certification' of the collective action, contending that they have at least facially satisfied the 'similarly situated requirement.'" *Id.*   Second, "after the necessary discovery is complete, defendants will move for 'decertification' of the collective action on the theory that the plaintiffs' status as 'similarly situated' was not borne out by the fully developed record." *Id.*

\ \ \ \ \

In the Ninth Circuit, "party plaintiffs are similarly situated, and may proceed in a collective to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id.* at 1117. "Significantly, as long as the proposed collective's 'factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 948 (9th Cir. 2019) (quoting *Campbell*, 903 F.3d at 1117). "This court considers the term 'similarly situated' in light of the purposes and goals of a collective action." *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (internal citations omitted). The claims and positions of the employees need not be identical. *Ballaris v. Wacker Silttronic Corp.*, No. 00-1627-KI, 2001 WL 1335809, at *2 (D. Or. Aug. 24, 2001).

A plaintiff can satisfy the "similarly situated burden" with a modest factual showing that plaintiffs and potential plaintiffs were victims of a common policy or plan that violated the law. *Id.* (internal citations omitted). In other words, a plaintiff need demonstrate only a reasonable basis for a claim the employer acted on a class-wide basis. *McElmurry*, 2005 WL 2492932, at *5 (citing *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996)).

A plaintiff who seeks collective action certification also must show other similarly situated employees wish to opt into the action. This "opt-in" aspect of Section 216(b) means a potential plaintiff does not become a member of the class unless he or she gives written consent and the consent is filed with the court. *Hargrove,* 1999 WL 1279651, at *3 (citing 29 U.S.C. § 216(b)). Thus, similarly situated employees become members of the class only by affirmatively choosing to join the class, and once joined they are bound by the ultimate judgment in the case. *Ballaris,* 2001 WL 1335809, at *1; *Hargrove,* 1999 WL 1279651, at *3.

\ \ \ \ \

Page 9  – OPINION AND ORDER

Ultimately, before certifying a collective action, the court must be satisfied there are potential members who desire to opt into the collective action. *Id.* at *4 (citing *Dybach v. Florida Dep't of Corrections,* 942 F.2d 1562, 1567–68 (11th Cir. 1991)). Moreover, a court, upon a sufficient basis, may infer "that other potential plaintiffs would wish to opt into the proposed class." *Id.*

After a district court grants preliminary certification, putative collective action members are given notice and advised they must decide whether to opt-in to the litigation:

> Assuming the collective action has survived its earlier scrutiny, the second stage will come at or after the close of relevant discovery. The employer can move for decertification of the collective action for failure to satisfy the similarly situated requirement in light of the evidence produced to that point. The district court will then take a more exacting look at the plaintiffs' allegations and the record.

*Campbell*, 903 F.3d at 1109 (internal citations and quotations marks omitted).

## Discussion

Hunter seeks an order that conditionally certifies the following FLSA class: "All current and former hourly, non-exempt employees including, but not limited to, nurses, nurse assistants, nurse aides, and other employees with similar job duties employed by Defendants throughout the United States from March 22, 2016, until the resolution of this action (the "Collective"). (Motion 2.) Hunter also asks the court to toll the statute of limitations until March 22, 2019. (*Id.* at 1.)

I.    First-Tier Analysis

Hunter argues the court should evaluate her motion using the lenient first-tier standard because discovery is ongoing. (Pl.'s Reply in Supp. of Pl.'s Mot., ECF No. 107 ("Pl.'s Reply"), 7.) The Ninth Circuit has articulated a two-step certification process for collective actions. *Campbell*, 903 F.3d at 1100. The first step occurs "at some point around the pleading stage," and the second step occurs "after the necessary discovery is complete." *Id.* At the preliminary

Page 10  – OPINION AND ORDER

certification stage, "the district court's analysis is typically focused on a review of the pleadings but may sometimes be supplemented by declarations or limited other evidence." *Id.* at 1109. Specifically, the Ninth Circuit has held a district court's level of consideration is "lenient," and "loosely akin to a plausibility standard, commensurate with the state of the proceedings." *Id.*

Legacy contends the court should adopt the "modest 'plus' standard" articulated in *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 826-827 (N.D. Ohio 2011) (Defs.' Opp'n to Pl.'s Mot., ECF No. 98 ("Defs.' Opp'n"), 10-11.) In *Creely*, the district court applied a "lenient standard with some consideration of the stage-two factors" because the parties had conducted "several months of limited discovery." *Id.* at 826. The court imposed this standard by "compar[ing] Plaintiffs' allegations set forth in their Complaint with the factual record assembled through discovery." *Id.* at 827. Here, Legacy argues the lenient first-tier standard is inappropriate because it has produced 12,065 pages of discovery to Hunter, including written policies and procedures, job descriptions, organizational charts, timekeeping and payroll records, and overtime logs. (Defs.' Opp'n 11.)

Although this court applied an intermediate standard in *Gesselle v. Jack in the Box, Inc.*, No. 3:10-cv-960-ST, 2013 WL 1326563, at *20 (D. Or. Jan. 28, 2013), because two years of "exhaustive discovery" had taken place, *Gesselle* is distinguishable from this case and illustrates why the *Creely* standard should not apply here. Here, Legacy did not produce the 12,065 pages of discovery until March 18, 2020 (Peck Decl. ¶ 9), two months before Hunter filed this motion. Hunter acknowledges she has received policy documents, but asserts she has received only a ten percent sample of putative Collective members from only one Legacy hospital. (Pl.'s Reply 7.) Moreover, Legacy has provided "personnel, payroll, and timekeeping records for some, but not all, of the Opt-In Plaintiffs." (*Id.*) Hunter also points out the parties have not taken depositions.

Page 11 – OPINION AND ORDER

(*Id.*)  Because extensive discovery has not occurred, the court concludes the first-tier analysis is the appropriate standard to evaluate Hunter's current motion.

     *A.*    *Similarly Situated*

The parties dispute whether Hunter has satisfied FLSA's "similarly situated" requirement. A plaintiff seeking conditional certification must produce sufficient evidence to create a reasonable inference she and her fellow class members are "similarly situated." *Sheffield*, 2002 WL 31696729, at *4.  The Ninth Circuit has held plaintiffs are similarly situated when they are "alike with regard to some *material* aspect of their litigation." *Campbell*, 903 F.3d at 1114.  Plaintiffs may establish they are similarly situated by demonstrating defendants followed a "common policy or plan" in violation of FLSA. *Ballaris*, 2001 WL 1335809, at *2.

Plaintiffs must demonstrate "a factual nexus which binds [plaintiffs] together as victims of an alleged policy or practice." *Id.*  (quoting *Wyatt v. Pride Offshore, Inc.*, Civ. A. No. 96-1998, 1996 WL 509654, at *2 (E.D. La. Sept. 6, 1996)).  This showing, at the first tier, "is based on the pleadings and affidavits submitted by the parties." *Adams*, 242 F.R.D. at 536.  Legacy contends Hunter's theory "requires a fact-laden inquiry, and Hunter's own evidence demonstrates they are not similarly situated with respect to the facts material to resolving their claim."  (Defs.' Opp'n 12.)

In her complaint, Hunter alleges Legacy violated FLSA's overtime provision.  (Compl. ¶ 76-93.)  She further contends Legacy failed to pay "[p]laintiff and proposed Collective members proper wages, including overtime wages and off-the-clock wages."  (Motion 1-2.)  Hunter asserts Legacy requires employees to deduct meal periods from their hours when Legacy knows they do not receive uninterrupted meal periods.  (*Id.* at 2.)  She argues this meal policy violates FLSA "whether by automatically deducting 30 minutes or by requiring nursing staff to clock out for their

meal break, while requiring Collective members to be on duty and subject to interruption." (*Id.* at 8.)  Hunter also contends Legacy "pressures nursing staff to clock in and clock out at certain times, regardless of whether nursing staff perform work while off-the-clock." (*Id.* at 2.)

Legacy argues Hunter's claims are without merit because the declarations have failed to demonstrate a common policy beyond Hunter's assertions in the complaint. (Defs.' Opp'n 12-13.)  Legacy contends the declarants' meal periods were disrupted in different ways and for different reasons, thus requiring a "fact-laden inquiry." (*Id.* at 13-15.)  For example, Legacy points out the declarations offer different reasons why the employees were "deemed on duty" during their meal periods. (*Id.* at 15.)  In other cases, some employees were required to carry mobile communication devices, while other employees stated they were often too busy to take any breaks. (*Id.* at 16.)  Moreover, Legacy asserts "for the entire Proposed Collective period, nursing staff who clocked out for meal breaks but were interrupted at any time during those 30 minutes, were required to clock back in and compensated for that missed meal period and any overtime that may have resulted from it." (*Id*. at 12.)  Therefore, Legacy maintains Hunter has failed to make a showing of a common policy or plan in violation of FLSA.

The Ninth Circuit has held, "as long as the proposed collective's 'factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Senne*, 934 F.3d at 948.  Here, Hunter has offered substantial allegations as well as declarations from non-exempt employees alleging they were not compensated for work performed during meal breaks and before and after they clocked in to work, in violation of FLSA.  Because employees' claims and positions need not be identical, *Ballaris*, 2001 WL 1335809, at *2, factual dissimilarities, such as those between employees who carried mobile devices and those who did not, do not defeat conditional certification.

Page 13 – OPINION AND ORDER

Moreover, as Hunter correctly points out, Legacy's arguments go to the merits of Hunter's claims, not whether she has sufficiently pleaded and supported at this stage a claim of common policy or plan that violates FLSA.   Hunter is not yet required to produce evidence her claims will succeed on the merits or that FLSA violations actually have occurred.   She has provided evidence that as non-exempt employees, Legacy nurses and other employees responsible for patient care were subject to similar break and off-shift compensation policies and structures under both of Legacy's timekeeping systems.

Hunter has alleged plausible legal theories based on a common scheme: employees responsible for patient care, such as RNs, were not compensated for work performed "off the clock," whether the time was during a meal period or before or after a scheduled shift.   Therefore, Hunter has established a common policy or plan in violation of FLSA sufficient to satisfy the lenient standard for a motion to conditionally certify a collective action.

B.    Others Who Wish to Opt In

After a court finds a proposed class is similarly situated, the court must be able to infer other potential class members would wish to "opt in" to the lawsuit.   *Hargrove*, 1999 WL 1279651, at *4.   At the initial stage, courts typically do not focus on whether the plaintiff has produced enough evidence of co-worker interest because the key inquiry is whether potential plaintiffs are similarly situated.   *See Ballaris*, 2001 WL 1335809 at *2.   From Hunter's declarations, the declarations of other current and former Legacy employees, and the evidence of twenty-five potential plaintiffs who have opted into the lawsuit, the court can infer others may wish to "opt in."   Accordingly, the court concludes the totality of Hunter's evidence is adequate to meet the initial burden of showing similarly situated employees wish to join the lawsuit.

\ \ \ \ \

Page 14  – OPINION AND ORDER

II.      Class Description and Notice

After a court conditionally certifies a collective, potential collective action members should receive "accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions as to whether to participate.'" *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).   Hunter asks the court to facilitate notice of her lawsuit to:

> All individuals who have worked for Defendant as non-exempt, hourly paid employees with patient care responsibilities, such as nurses, nursing aides, nursing assistants, and other similarly situated workers in the United States at any time within the three year statute of limitations period or FLSA claims under 29 U.S.C. § 225(a).

([Proposed] Order Granting Pl.'s Mot. ECF No. 78-7.)

Legacy objects to Hunter's proposed notice for four reasons.   First, Legacy contends Hunter's proposed collective is overbroad and it asks the court to limit the scope of the proposed collective to only RNs and only those at Emanuel and Randall.   ((Defs.' Opp'n 21-22.)   Legacy argues the American Nursing Association's ethical rules only apply to RNs and, consequently, Hunter has failed to show a "factual nexus" among the various job titles in Hunter's proposed collective at Legacy's various facilities.   (*Id.* at 22)   Hunter responds that "conditional certification only concerns Plaintiff's substantial allegations."   (Pl.'s Reply 19.)   The court agrees:   as noted above, these assertions address the merits of Hunter's claims, which is inappropriate for determination at the preliminary certification stage.

Second, Legacy objects to Hunter's 120-day proposed opt-in period and recommends the court order a 60-day opt-in period instead.   (Defs.' Opp'n 23.)   Hunter contends a 120-day period is appropriate "in light of the number of potential plaintiffs."   (Motion 29).   Moreover, Hunter contends the potential Collective could include "upwards of 5,000 nurses and nursing assistants" who are likely responding to the COVID-19 global pandemic.   (Pl.'s Reply 27.)

The court agrees that a 120-day notice period is appropriate. District courts have held 120-day opt-in periods are too long for collective actions under FLSA, while thirty-day periods may be too short. *Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 WL 824652, at *4 (N.D. Cal. Mar. 28, 2006); *Shaia v. Harvest Mgmt. Sub LLC*, 306 F.R.D. 268, 276 (N.D. Cal. Apr. 13, 2015). However, courts have also granted 120-day opt-in periods when "the group of potential plaintiffs is exceedingly large and geographically dispersed," the court rejected equitable tolling, and the longer opt-in period would not prejudice the defendant. *Prentice v. Fund for Pub. Interest Research, Inc.*, No. C-06-7776 SC, 2007 WL 2729187, at *4 (N.D. Cal. Sept. 18, 2007). Because Hunter's notice will be sent to a large group of individuals across several states, a 120-day deadline for those potential plaintiffs to file consent to join is appropriate.

Third, Legacy asks the court modify Hunter's proposed notice to warn potential plaintiffs of potential discovery requirements and legal fees, because "opt-in plaintiffs deserve to be advised that if they opt-in to the lawsuit, they bear all the risks and obligations that a plaintiff ordinarily bears, like the obligation to participate in discovery and the risk that attorney fees will be assessed against them." (Defs.' Opp'n. 23-24.) Hunter contends such a warning really is intended to chill plaintiff participation. The court agrees.

District courts have held language warning potential plaintiffs about the possibility of discovery "is unnecessary and inappropriate." *Prentice*, 2007 WL 2729187, at *5 ("Including a warning about possible discovery when that discovery is unlikely will serve no purpose other than deterring potential plaintiffs from joining the suit based on unfounded concerns about the hassle of discovery."); *Russell v. Swick Mining Services USA Inc.*, No. CV-16-02887-PHX-JJT, 2017 WL 1365081 at *5 (D. Ariz. Apr. 14, 2017). As to warnings about potential litigation costs, such warnings "would undermine the FLSA's goal of encouraging full enforcement of statutory rights."

*Carrillo v. Schneider Logistics, Inc.*, No. CV 11-8557 CAS (DTBx), 2012 WL 556309 at *14 (W.D. Cal. Jan. 31, 2012).    Accordingly, the court will not require the notice to include a warning about potential discovery or attorney fee obligations.

Fourth, Legacy asks the court to deny Hunter's request for proposed collective members' social security numbers.  (Defs.' Opp'n 24.)   Hunter contends social security numbers would permit the third-party notice administrator to locate potential collective members' contact information when the available information "is outdated or otherwise inaccurate because the person moved, abandoned their old email address, or changed phone numbers."   (Pl.'s Reply 26.) The court disagrees that social security numbers are necessary for notice purposes.

District courts often deny plaintiffs' requests for social security numbers.  *Shaia*, 306 F.R.D. 268 at *275;   *Cuevas*, 2019 WL 5320544, at *6 (denying the plaintiff's request for employees' birthdays and security numbers for privacy reasons);   *Delgado v. Ortho-McNeil, Inc.*, No. SACV07-263CJCMLGX, 2007 WL 2847238, at *3 (C.D. Cal. Aug. 7, 2007).   Other courts granted a variation of such requests and ordered defendants to provide the last four digits of potential plaintiffs' social security numbers.  *Rozenboom v. Dietz & Watson, Inc.*, No. 2:17-cv-01266-RAJ, 2018 WL 2266692, at *3 (W.D. Wash. May 17, 2018);   *Syed v. M-I, L.L.C.*, No. 1:12-CV-1718 AWI MJS, 2014 WL 6685966, at *8 (E.D. Cal. Nov. 26, 2014).   Still other courts have taken intermediate responses to social security number requests.  *Thomas v. Kellogg Co.*, No. C13-5136 RBL, 2014 WL 716152, at *3 (W.D. Wash. Jan. 9, 2014) (ordering defendants to provide "the last four digits of the social security numbers of the class members whose notices are returned without forwarding addresses");   *Gilbert v. Citigroup, Inc.*, No. 08-0385 SC, 2009 WL 424320, at *6 (N.D. Cal. Feb. 18, 2009) ("Plaintiffs may move to compel production of social security numbers if this contact information is not sufficient to provide notice to a large percentage

Page 17  – OPINION AND ORDER

of the potential class members").

The court concludes that the names, last known mailing addresses, email addresses, and telephone numbers, coupled with the 120-day opt-in period, are sufficient to permit notice and communication with potential members of the collective action.    Consequently, Hunter's request to include the social security numbers of potential collective members is denied.

III.    Equitable Tolling

Hunter asks the court to toll the statute of limitations for opt-in plaintiffs to March 22, 2019, the date by which Hunter requested Legacy provide the proposed collective members' identities and contact information.   (Motion 1, 29.)[2]   Typically, a potential plaintiff must submit his or her consent to become a party plaintiff within two years of an alleged FLSA violation.   29 U.S.C. § 255(a)(2018).    However, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."   *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129 (1988) (citing 29 U.S.C. § 255(a)).

In general, "[e]quitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant or when extraordinary circumstances beyond a plaintiff's control made it impossible to file a claim on time."   *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th. Cir. 1999).    Further, the Ninth Circuit has held equitable tolling is appropriate when "such tolling is supported by substantial policy reasons."   *Partlow v. Jewish Orphans' Home of Southern Cal., Inc.*, 645 F.2d 757, 761 (9th Cir. 1981).

Procedural delays typically do not justify equitable tolling.   *See Cranney v. Carriage*

---

[2] Hunter's Proposed Order Granting Plaintiff's Motion for Conditional Certification reflects a tolling date of March 22, 2016.   (ECF No. 78-7.)   The court will consider the March 22, 2019 date reflected in Hunter's Motion.

*Services*, 559 F.Supp.2d 1106, 1109 (D. Nev. 2008).    Specifically, FLSA "does not require Defendants to provide contact information for potential plaintiffs until *after* the court certifies the collective action."    *Prentice*, 2007 WL 2729187, at *3;    *Shaia*, 2015 WL 1744341, at *3.

Hunter contends tolling is appropriate because Legacy improperly withheld the contact information for potential plaintiffs and did not produce other discovery documents until March 2020.   (Motion 29-30.)   Legacy argues Hunter is not entitled to tolling because Hunter has not demonstrated any extraordinary circumstances prevented timely filing.   (Defs.' Opp'n. 25.)   The court agrees.   Legacy's refusal to provide the contact information prior to a collective order does not constitute wrongful conduct that would justify equitable tolling, and Hunter has not provided evidence of any extraordinary circumstances.   Accordingly, the court concludes Hunter is not entitled to equitable tolling.

## Conclusion

The court concludes Hunter has satisfied FLSA's lenient preliminary certification standard. Accordingly, Hunter's motion for conditional certification (ECF No. 78) is GRANTED IN PART and DENIED IN PART, as set forth above.

IT IS SO ORDERED.

DATED this 4th day of January, 2021.

_____
JOHN V. ACOSTA
United States Magistrate Judge